# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DARRYL MCKENZIE
816 Camp Ground Rd.,
Columbia, SC 29203,

     *Plaintiff,*

v.

UNITED STATES DEPARTMENT OF THE
NAVY; JOHN C. PHELAN, in his official
capacity as Secretary of the Navy; JENNIFER
A. LATORRE, in her official capacity as Acting
Assistant Secretary of the Navy for Manpower
and Reserve Affairs; and ELIZABETH HILL,
in her official capacity as Executive Director of
the Board for Correction of Naval Records,
1000 Navy Pentagon,
Washington, D.C. 20350,

     *Defendants.*

Civil Action No. 1:25-cv-3030

# COMPLAINT

1.    Plaintiff Darryl McKenzie brings this action for declaratory and injunctive relief pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq. ("APA") and the Declaratory Judgement Act, 28 U.S.C. §§ 2201–2202.

2.    McKenzie, a Marine Corps veteran, applied to the Board for Correction of Naval Records to upgrade the status of his discharge from "Other Than Honorable" on the basis of evidence establishing that his misconduct was mitigated by the presence of Post-Traumatic Stress Disorder ("PTSD") and depression; Department of Defense ("DoD") guidance regarding the need for liberal consideration of service-related mental health conditions in discharge upgrades; and evidence demonstrating that considerations of equity warranted the relief sought.

3.    In support of his application, McKenzie presented evidence that his physician diagnosed him with PTSD, that his PTSD diagnosis was confirmed by Department of Veterans' Affairs ("VA") staff, and that the VA granted a service-connection for McKenzie's PTSD for treatment purposes.

4.    McKenzie also submitted letters from himself, his wife, his physician, and a longtime friend explaining the mental toll that his time in the military took on him.

5.    The record established that McKenzie suffered from a mental health condition during and after his time in service and that his misconduct stemmed, at least in part, from those conditions. Nevertheless, the Board denied McKenzie's upgrade request on January 7, 2025. This suit seeks judicial review of the Board's decision (Exhibit A).

6.    The Board's decisions concerning discharge-upgrade requests are "subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence." *Chappell v. Wallace,* 462 U.S. 296, 303 (1983); *Dickson v. Sec'y of Def.,* 68 F.3d 1396, 1402 (D.C. Cir. 1995) (quoting *Chappell*, 462 U.S. at 303).

7.    The Board's ruling on McKenzie's discharge-upgrade request fails the "basic procedural requirement[t] … that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

8.    The Board's decision did not employ the governing "liberal consideration" standard, failed to grapple with key evidence (including a medical opinion from McKenzie's treating physician and the VA's finding that McKenzie's PTSD was service-connected), relied on a deeply flawed advisory opinion from a clinician who never examined McKenzie, and did not comport with binding DOD guidance.

9.    The Board's decision should be set aside.

10.    McKenzie accordingly requests that the Court (1) declare the Board's decision is arbitrary and capricious, unsupported by substantial evidence, contrary to law, and without observance of procedure required by law, (2) set aside the decision, and (3) upgrade McKenzie's discharge characterization or alternatively remand for further consideration of McKenzie's request.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 2201–02, and may hear this action pursuant to the APA, 5 U.S.C. §§ 701–06, because McKenzie seeks review of final agency action for which there is no other adequate remedy.

12.     Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) because Defendants are principally located in the District of Columbia and a substantial part of the events giving rise to the claim occurred in the District of Columbia.

## PARTIES

13.     Plaintiff Darryl McKenzie is a United States Marine Corps veteran. He is a citizen of the United States, resides in South Carolina, and served in the Marine Corps from 1982 to 1984.

14.     Defendant the United States Department of the Navy is a service department in the Department of Defense. It has responsibility for the administration, control, and operation of the United States Navy and its sister service, the United States Marine Corps. The civilian head of the Department of the Navy is the Secretary of the Navy.

15.     John Phelan is the United States Secretary of the Navy and is named solely in his official capacity. Secretary Phelan is authorized by statute (10 U.S.C. § 1552) to act through a board of civilians to correct any military record of a former member of the Navy or Marine Corps when doing so is necessary to correct an error or to remove an injustice.

—3—

16.    Defendant Jennifer A. LaTorre is Acting Assistant Secretary of the Navy for Manpower and Reserve Affairs and is named only in her official capacity. Secretary LaTorre exercises authority delegated by the Secretary of the Navy to accept or reject recommendations from the Board related to applications for the correction of military records, including discharge upgrades.

17.    Defendant Elizabeth Hill is the Executive Director of the Board for Correction of Naval Records and is named solely in her official capacity. Director Hill exercises authority delegated by the Secretary of the Navy to administer and oversee the Board's operation.

## STATUTORY AND REGULATORY BACKGROUND

### I.    The Board's Authority to Correct Military Records

18.    Following World War II, Congress passed and the President signed legislation that provides a mechanism to amend military records when "necessary to correct an error or remove an injustice." 10 U.S.C. §1552(a)(1).

19.    Subject to exceptions not relevant in this case, "such corrections shall be made by the Secretary [of each military branch] acting through boards of civilians." *Id*.

20.    "[E]xcept where procured by fraud," decisions of these boards are "final and conclusive on all officers of the United States." *Id*. § 1552(a)(4)–(5); *see also* 32C.F.R. § 723.6(e) (providing that the Board is authorized to take "final corrective action" on behalf of the Secretary).

21.    Pursuant to that statutory framework, the Navy established the Board for Correction of Naval Records to consider and act upon correction requests of Navy

and Marine Corps service members and veterans. *See* 32 C.F.R. § 723.1 (creating Board).

22.    Reflecting Congress's desire that veterans with erroneous or unjust records have real, available remedy, the Board's authority is broad and includes the correction of military records: (a) to change the reason for discharge to medical separation or retirement; (b) to reinstate a veteran to military service; (c) to re-characterize a veteran's less than fully honorable discharge; (d) to change the basis for a discharge; (e) to avoid a pass over of a candidate for promotion; (f) to establish eligibility for pay and/or retirement benefits; (g) to increase or change active-duty service time, which in some cases will create eligibility for VA benefits or military retirement; and (j) to take other actions as may be necessary to correct material error or injustice. 10 U.S.C. § 1552(a)(1); *see also* 32 C.F.R. § 723.3(a) (describing authority of the Board to correct records).

23.    The Board operates within the Office of the Secretary of the Navy, in accordance with 10 U.S.C. § 1552. The Board consists of senior Navy civilian employees who are appointed and serve at the pleasure of the Secretary of the Navy. A panel consisting of at least three board members considers each application, with one member serving as the panel chair. *See* 32 C.F.R. § 723.3(e)(1).

24.    Federal regulations guide the Board's consideration of applications for correction. Among other things, the Board may obtain information from the applicant or the Department of the Navy and may likewise request advisory opinions from Navy sources. *See id.* § 723.6(a). Any decision of the Board must be consistent with

comments by proper naval authority. *See id.* § 723.6(e)(1)(i). In cases involving PTSD as a supporting rationale for relief, the Board must seek advice and counsel from a psychiatrist, psychologist, or social worker with training on PTSD. *See* 10 U.S.C. § 1552(g)(2).

25.    A majority vote of the panel constitutes an action of the Board. 32 C.F.R. § 723.6(a)(3).

26.    When the Board denies a previously denied application without a hearing, the Board's determination must be in writing and include a statement of the grounds for denial. *See id.* § 723.3(e)(3). The Board's written statement must include all the essential facts upon which the denial is based, "including, if applicable, factors required by regulation to be considered for determination of the character of and reason for discharge." *Id.* § 723(e)(4). Attached to the Board's statement must be "any advisory opinion considered by the Board which is not fully set out in the statement." *Id.* The Board must then promptly furnish the statement on the grounds for denial, along with any attachments, to the applicant. *See id.* § 723.3(e)(5).

## II.    DoD Guidance Regarding Mental Health, Equity, and Injustice

27.    The Department of Defense has issued robust, binding guidance for boards charged with making corrections to military and naval records. This guidance was issued through interpretive memoranda that provided clarification to boards with respect to the review of discharge-upgrade applications filed by veterans with mental health conditions. All of these memoranda apply to veterans who received less-than-honorable discharges as a result of misconduct, including Other than Honorable discharges.

28.    *Hagel Memo.* The first memorandum was issued by then-Secretary of Defense, Chuck Hagel, on September 3, 2014. *See* Secretary of Defense, *Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgrade Requests by Veterans Claiming Post Traumatic Stress Disorder* (Sept. 3, 2014).[1] The Hagel Memo provides that an upgrade request must be given "liberal consideration" when "[s]ervice records or any document from the period of service substantiate the existence of one of more symptoms" of PTSD or a PTSD-related condition at the time of service. *Id.*

29.    The Hagel Memo further states:

> Liberal consideration will also be given in cases where civilian providers confer diagnoses of PTSD or PTSD-related conditions, when case records contain narratives that support symptomology at the time of service, or when any other evidence which may reasonably indicate that PTSD or a PTSD-related disorder existed at the time of discharge which might have mitigated the misconduct that caused the [other] than honorable conditions characterization of service.

30.    Under the Hagel Memo, the Board was required to consider PTSD or PTSD-related conditions as a mitigating factor in the misconduct that contributed to McKenzie's less-than-honorable discharge and give "liberal consideration" to his request for an upgrade.

31.    *Kurta Memo.* Building on the Hagel Memo, then-Under Secretary of Defense for Personnel and Readiness, Anthony Kurta, issued a memorandum on August 25, 2017, clarifying that the previously issued interpretative guidance should

---

[1] https://law.yale.edu/sites/default/files/documents/pdf/Clinics/vlsc_Hagel_Memo.pdf.

benefit not only veterans who suffer from PTSD and related conditions, but also those who face other service-related mental health conditions. *See* Under Secretary of Defense for Personnel and Readiness, *Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modifications of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment* (Aug. 25, 2017).[2]

32.    The Kurta Memo requires boards to give "liberal consideration" to discharge upgrade petitions that are based on mental health conditions, including PTSD. *Id.* Veterans are not required to furnish proof of a physician's diagnosis in order to establish that they suffered from a mental health condition. Rather, according to the Kurta Memo, evidence of a mental health condition can include "statements from family members … [and] friends," "changes in behavior," "substance abuse," "episodes of depression," "misconduct" itself, and even the "veteran's testimony *alone*." *Id.* at 1–2 (emphasis added). In other words, a veteran's testimony that he suffered from a mental health condition is sufficient to establish that the condition existed during military service, which in turn obligates the Board to give liberal consideration to a discharge petition that is based on that condition.

33.    When giving liberal consideration in a case involving marijuana use, the Kurta Memo makes clear that boards should recognize that "marijuana use … may

---

[2] https://dod.defense.gov/Portals/1/Documents/pubs/Clarifying-Guidance-to-Military-Discharge-Review-Boards.pdf.

be viewed, in the context of mitigating evidence, *as less severe today than it was decades ago.*" *Id.* at 4 (emphasis added).

34.    *Wilkie Memo.* On July 25, 2018, then-Under Secretary of Defense Robert Wilkie issued guidance to clarify and assist with determinations involving equity, justice, or clemency. *See* Under Secretary of Defense for Personnel and Readiness, *Guidance to Military Discharge Review Boards and Boards for Correction of Military / Naval Records Regarding Equity, Injustice, or Clemency Determinations* (July 25, 2018).[3]

35.    The Wilkie Memo centers around ideas of fairness. It states: "It is consistent with military custom and practice to honor sacrifices and achievements, to punish only to the extent necessary, to rehabilitate to the greatest extent possible, and to favor second chances in situations in which individuals have paid for their misdeeds." *Id.* at 1. The Wilkie Memo further requires Boards to consider that "[a]n honorable discharge characterization does not require flawless military service," and that "[m]any veterans are separated with an honorable characterization despite some relatively minor or infrequent misconduct." *Id.* at 2.

36.    The Wilkie Memo lists several factors that the Board should consider when evaluating a discharge upgrade petition, including an applicant's "[a]cceptance of responsibility, remorse, or atonement for misconduct," post-discharge conduct, "[l]etters of recommendation," "[c]haracter references," and whether the misconduct

---

[3]https://arba.army.pentagon.mil/documents/Wilke20180725JusticeEquityClemency.pdf.

may have been because of "youthful indiscretion." *Id*. at 3. Moreover, the Wilkie Memo emphasizes that "[t]he relative severity of some misconduct can change over time," and calls out marijuana use as misconduct that Boards may view as "less severe today." *Id*. at 2.

## III.    Additional Federal Policy Updates

37.    Recent policy updates reflect the Navy's current position that mental health conditions should be viewed as mitigating factors when considering whether misconduct should lead to separation.

38.    Although prior Navy policy describing the circumstances when misconduct should lead to separation stated that "a service member's misconduct took precedence over diagnosed mental health conditions," recent policy updates make clear that mental health conditions that contribute to misconduct will "take precedence" when considering whether the service member should be separated. *See SECNAV Announces New Administrative Separation Policy* (June 30, 2016).[4] Any service member who was separated from service under prior policy may seek to have his or her discharge reviewed and upgraded by the Board. *See id.*

---

[4]https://www.dcmilitary.com/quarterdeck/news/secnav-announces-newadministrative-separation-policy/article_61132c98-94ea-5d02-9e04-3b79df5ccc31.html.

39.    In addition, the VA recently revised its policy on marijuana use to provide that "[v]eterans will not be denied VA benefits because of marijuana use" and encourages veterans "to discuss marijuana use with their VA providers."[5]

40.    More generally, the federal government's attitude towards marijuana use has become less severe in recent years. For example, on October 6, 2022, President Biden pardoned all prior federal offenses of simple possession of marijuana and proclaimed that "no one should be in jail for using or possessing marijuana."[6] The United States military has also changed its attitude towards marijuana use in the last five years by, for example, giving "3,400 new recruits who failed a drug test on their first day a grace period to try again"; in particular, the "Marine Corps and Air Force … recently began allowing recruits a second opportunity to take drug tests."[7]

41.    Collectively, these recent revisions to federal policies make clear that marijuana is viewed as far less severe today than it was only a couple of decades ago, and that the federal government has created multiple pathways for those previously punished for marijuana use to have those punishments reviewed and retracted.

---

[5] *See* U.S. Dep't of Veterans Affairs, *Public Health*, https://www.publichealth.va.gov/marijuana.asp#:~:text=Some%20things%20Veteran%20need%20to,use%20with%20their%20VA%20providers (last visited June 12, 2023).

[6] *See* The White House, *Statement from President Biden on Marijuana Reform* (Oct. 6, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/10/06/statement-from-president-biden-on-marijuana-reform/.

[7] *See* Ernesto Londono, *Needing Younger Workers, Federal Officials Relax Rules on Past Drug Use*, N.Y. Times, Apr. 30, 2023, https://www.nytimes.com/2023/04/30/us/marijuana-drugs-federal-jobs.html.

## FACTUAL BACKGROUND

**A.    McKenzie enlists in the Marine Corps.**

42.    McKenzie was born on August 22, 1963, in New York City. During his childhood, his father moved the family to Columbia, South Carolina. Shortly after their arrival, McKenzie's father passed away unexpectedly. As the eldest of three sons, McKenzie took it upon himself to help his mother raise his siblings, despite only being around ten years old at the time.

43.    McKenzie excelled as a high school football player and earned a scholarship to play in college. His college career was cut short, however, when McKenzie returned home to support his family. To do so, McKenzie followed in his father's footsteps and joined the armed forces, enlisting in the Marine Corps on December 30, 1982, at the age of nineteen.

44.    McKenzie performed capably in the antitank and security units at the start of his military service. McKenzie's superiors gave him high marks, rating his conduct and performance between 4.3 and 4.4 out of 5.0 in the months leading up to his injury. McKenzie earned both the Marksman Rifle Badge and the Sharpshooter Pistol Badge during this time.

**B.    McKenzie develops PTSD after a harrowing in-service injury and continual abuse from his fellow Marines.**

45.    While stationed at Naval Weapons Station Seal Beach, McKenzie suffered a debilitating and traumatic injury. On July 8, 1983, as McKenzie bench-pressed a 300-lb weight, he heard and felt a ripping sound followed by excruciating pain on his right side. Unable to support the barbell, the weight crashed on his chest

with enormous force and began to roll onto his neck. McKenzie was unable to lift the weight as it continued toward his windpipe. Gripped with fear, McKenzie believed that these were the last moments of his young life.

46.    Thankfully, a passerby noticed McKenzie struggling and helped remove the weight. McKenzie was taken to the hospital and diagnosed with a partial tear of his right pectoralis. As treatment, he was put on bedrest for 72 hours, told to wear a sling for two weeks, and directed to remain on "light duty" for five weeks. However, against the physician's orders, McKenzie's superiors prematurely rushed him back to duty, placing McKenzie on a 24-hour post while he was still being medicated for his injuries.

47.    While McKenzie's physical injuries began to heal, new mental wounds formed. Shortly after this weightlifting accident, he began to experience flashbacks, nightmares, and an absolute fear of the excruciating pain that he endured. Fear of death consumed McKenzie's every thought. Despite his best efforts to move past the experience, McKenzie felt "paralyzed." He dreaded physical activity and stopped exercising altogether. His personal hygiene declined. He would wake up screaming from nightmares in which he was being crushed or buried alive. As his burgeoning mental illness made daily tasks impossible, McKenzie felt completely "useless" and "broken."

48.    As McKenzie's mental health declined, he found no comfort in his fellow Marines. Instead of offering their support, McKenzie's peers and superiors ostracized

and harassed him. McKenzie's feelings of uselessness and despair were explicitly and implicitly reinforced by the words and actions of others.

49.     After his injury, a Staff Sergeant forced him to balance on one leg in front of his company, all while being told that he was not really hurt. The same Staff Sergeant would frequently wake McKenzie up in the middle of the night, excusing his behavior by telling McKenzie that he was only "checking" on him. Another Sergeant told McKenzie that an injured Marine "isn't any good to us." Toward the end of his time in service, a supervisor advised McKenzie, "We don't need your kind here."

50.     Because some of his fellow Marines perceived McKenzie to be a malingerer, he was also assaulted by his peers as a form of punishment. McKenzie was traumatized by "blanket parties," episodes when he would awake to a group covering him in a sheet and then viciously beating him under the cover of night. Not only did McKenzie fear for his life in these moments, but the attackers' anonymity also fed his paranoia. Between his traumatic injury and these assaults, McKenzie felt like he had "already died" and was now "doing time in hell."

**C.     McKenzie, tormented by mental illness and mistreatment, was discharged for a string of post-injury infractions.**

51.     McKenzie turned to marijuana and alcohol to cope with his feelings of anxiety and depression. Feeling increasingly distrustful and disdainful towards authority, McKenzie acted out on a number of occasions. McKenzie was late to his post, failed to follow orders to remove an earring, and invited a woman into the Bachelors Enlisted Quarters.

—14—

52.    These misbehaviors began only a month and a half after his July 1983 injury, and ultimately led to his discharge on January 20, 1984 with an "Other Than Honorable" characterization of service.

**D.    Post-discharge, McKenzie confronts his afflictions.**

53.    After his discharge, McKenzie's life continued to spiral out of control. He grew increasingly dependent on alcohol. One year after his discharge, McKenzie was incarcerated for assault. He spent the next 26 years cycling in and out of prison.

54.    While in prison, McKenzie became sober and vowed to improve his life. He was released in 2010 and began to turn his life around the next year when he married his childhood best friend of over 50 years, Audrey.

55.    In 2012, McKenzie and Audrey started a successful long-haul trucking company. And in 2016, in a desire to give back to his community and replicate the efforts of those who had helped him, McKenzie and one of his brothers started a non-profit, Genesis 4, to help others in the criminal justice system reenter society. The Mayor of Columbia recognized their work in 2017. His mentorship role has also taken the form of speeches to community youth on proper life choices, as well as coaching young adults' sports.

56.    While McKenzie has made strides in his own and others' personal lives, he continues to struggle with his mental health. In 2018, he was diagnosed with PTSD and since then he has also been diagnosed with Major Depressive Disorder.

57.    In 2021, McKenzie's treating psychiatrist, Dr. Elizabeth Alford, noted that his PTSD symptoms were "so severe that he can only tolerate short periods of

therapy" and "[h]is emotional instability is such that he has difficulty even leaving his home and interacting with others." Additionally, Dr. Alford found that "[h]is attention and concentration are extremely poor and he struggles with auditory hallucinations and paranoia, both of which are leading to difficulty sleeping." Dr. Alford observed that he often thinks about suicide.

58.    In 2023, the VA confirmed McKenzie's PTSD diagnosis and granted service-connection for this condition for treatment purposes.

## PROCEDURAL BACKGROUND

### A.    Previous Discharge Upgrade Petitions.

59.    McKenzie, proceeding *pro se*, previously submitted an application to the Board to upgrade his discharge status, receiving denials in 2008 and 2020. Both times, the Board could not substantiate McKenzie's in-service physical injury because it did not have access to his medical records.

### B.    Current Discharge Upgrade Petition.

60.    McKenzie, now represented by counsel, submitted a new discharge upgrade request to the Board on April 5, 2024. In response to the Board's prior statements that it could not properly assess McKenzie's medical claims because of a lack of documentation, McKenzie submitted extensive exhibits providing that information. McKenzie included the military records detailing his training injury, as well as various personal accounts—spanning multiple decades—detailing the physical and emotional anguish that the injury and his subsequent ostracization caused.

61.     McKenzie also submitted his PTSD diagnoses from the VA and from his clinical psychiatrist, Dr. Alford, both of whom directly tied McKenzie's mental health condition to his service. Finally, McKenzie included statements from himself and those closest to him that chronicled his past and ongoing struggles with mental illness, as well as his personal rehabilitation and community service.

62.     The Board, however, stated that McKenzie's evidence was "insufficient to establish the existence of probable material error or injustice."

63.     In its decision, the Board relied heavily upon an advisory opinion from an outside clinical psychologist. (*See* Exhibit B).

64.     Unlike the VA and Dr. Alford, the psychologist did not personally evaluate or treat McKenzie. Instead, the psychologist reached the conclusion that there was "insufficient evidence" to attribute McKenzie's misconduct to a mental health condition solely through review of McKenzie's records.

65.     The psychologist did not address or reference Dr. Alford or the VA's medical evaluations, but rather focused on McKenzie's 2011 testimony during a Board of Veterans' Appeals hearing over his ability to collect benefits despite his discharge status.

66.     The Board ultimately "concurred" with the advisory opinion's finding that McKenzie presented "insufficient evidence."

67.     The Board also stated that McKenzie's misconduct outweighed any mitigation that his PTSD may offer. Particularly, the Board harped on McKenzie's marijuana possession, asserting that it "poses an unnecessary risk to the safety of

[his] fellow service members." The Board went so far as to consider evidence that was not before it, hypothesizing about the "likely negative impact" that McKenzie's misconduct "had on the good order and discipline of [his] command."

68.    While the Board made passing reference to the Kurta, Hagel, and Wilkie Memos requiring "liberal consideration" of applications like McKenzie, the Board's decision contains only the *ipse dixit* that it "carefully considered" McKenzie's evidence and the Memos' guidance without any explanation *why* it rejected that evidence or how its determination comported with liberal consideration.

### FIRST CLAIM FOR RELIEF

**Violation of APA – Arbitrary and Capricious, Unsupported by Substantial Evidence, and Contrary to Law Agency Action**

69.    The above paragraphs are incorporated herein by reference.

70.    "[A]gency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1977).

71.    An agency action is also unlawful when the agency fails to articulate a rational connection between the facts found and the choice made, fails to consider an important aspect of the problem, or offers an explanation for its decision that runs counter to the evidence. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

72.    The Board's decision is unlawful for multiple reasons.

—18—

73.  *First*, the Board failed to review McKenzie's claims with the "liberal consideration" mandated by 10 U.S.C. § 1552(h)(2) and DoD guidance, including the Kurta Memo, the Hagel Memo, and the Wilkie Memo.

74.  While the Board's decision said that it was applying "liberal consideration," the decision does not indicate *how* that standard was applied or *why* the record supported denying the petition under that standard.

75.  Instead, the Board decision improperly treated "liberal consideration" as "magic words" instead of "robustly engag[ing] with the evidence specifically affecting [McKenzie.]" *Jeanpierre v. United States*, 176 Fed. Cl. 11, 32 (2025) (quoting *Bee v. United States*, No. 21-1970, 2024 WL 3912596 (Fed. Cl. Aug. 23, 2024)).

76.  Federal law and DoD guidance required the Board to apply "liberal consideration" to discharge upgrade applications like McKenzie's that are "based in whole or in part on matters relating to mental health conditions, including PTSD." Kurta Memo at ¶ 3; *see also* 10 U.S.C. § 1552(h)(1).

77.  Instead, the Board's decision said only that "there was no evidence that [McKenzie was] diagnosed with a mental health condition while in service," which directly contravenes DoD guidance that the Board "should not condition relief on the existence of evidence that would be unreasonable or unlikely under the specific circumstances of the case." Kurta Memo at ¶ 26(f).

78.  Expecting a PTSD diagnosis at the time of McKenzie's discharge in 1984 is manifestly unreasonable and is *precisely why* the DoD provided further guidance on this topic in the later Hagel and Kurta memos. Hagel Memo at ¶ 1 ("In these cases,

PTSD was not recognized as a diagnosis at the time of service and, in many cases, diagnoses were not made until decades after service was completed."); *see also* Kurta Memo at ¶ 26(b) ("It is unreasonable to expect the same level of proof for injustices committed years ago when TBI; mental health conditions, such as PTSD; and victimology were far less understood than they are today.").

79.    Likewise, the Board disregarded the Kurta Memo's guidance that a "veteran's testimony alone, oral or written, may establish the existence" of PTSD. Kurta Memo, ¶ 7; Wilkie Memo, ¶ 6(e). The Board's decision never addressed McKenzie's testimony regarding his mental health, relying instead on the advisory opinion's conclusory allegation that McKenzie's statement was "inconsistent with his anecdote of what occurred during the 2011 Va Appeals Aboard [sic]." Inconsistent in what way? The advisory opinion never said, and neither did the Board's decision.

80.    Additionally, the Board failed to consider that "[e]vidence may come from … mental health counseling centers … physicians … and statements from family members [and] friends." Kurta Memo, ¶ 4. The Board's decision never addressed the statements of McKenzie's wife or lifelong friend.

81.    The Board also disregarded the Kurta and Wilkie Memo's guidance that "[t]he relative severity of some misconduct can change over time, thereby changing the relative weight of the misconduct to the mitigating evidence in a case. For example, marijuana use … may be viewed, in the context of mitigating evidence, as less severe today than it was decades ago." Wilkie Memo, ¶ 6(g). The Board ignored the Memos' guidance when it failed to consider changes in federal law and the less

severe nature of marijuana use today. Again, the Board decision never explained *why* it disregarded the DoD's guidance.

82.    *Second,* the Board failed to give a reasoned explanation for its conclusions. The Board made no effort to explain *how* the evidence of McKenzie's marijuana use outweighed the evidence that McKenzie presented or indeed *why* the evidence of McKenzie's drug use and other behavior was *not* evidence of mental illness. While the decision included the *ipse dixit* sentence that the Board considered McKenzie's "application … with all material submitted in support thereof," the decision did not say what specific evidence the Board considered in reaching its decision, nor, critically, *why* or *how* that evidence was unpersuasive.

83.    For example, Dr. Alford concluded that McKenzie's time in the military "is a major contributor to [his] PTSD symptoms," noting that his symptoms are a "classic trauma response" related to the "extremely painful injury associated [with] fear of dying," and "the [repeated] assault in the middle of the night by his peers" that McKenzie suffered while serving. (*See* Exhibit C). The Board never attempted to weigh Dr. Alford's findings against the advisory opinion, nor to explain why it chose to credit the advisory opinion over that of McKenzie's treating physician.

84.    Likewise, the Kurta Memo explicitly recognizes that a "determination made by the [VA] that a veteran's mental health condition, including PTSD … is connected to military service … is persuasive evidence that the condition existed … during military service." Kurta Memo, ¶ 14. McKenzie submitted evidence demonstrating that the VA found his PTSD to be service-connected. (Exhibit D). But

the Board's decision nowhere addresses the VA's finding of service connection at all, let alone why it would not be persuasive evidence.

85.   The Board also failed to grapple with the well-documented fact that McKenzie suffers from more than one mental health disorder—and likely did at the time of his discharge. The Board failed to consider—as Dr. Alford noted—that McKenzie's behavior and symptoms are consistent with PTSD *and* Major Depressive Disorder.

86.   *Third*, the Board failed to explain why it relied on an advisory opinion that either misunderstood or mischaracterized the record. The AO based its conclusion, in part, on a hearing before the Board of Veteran's Appeals ("BVA") in 2011, but that hearing was not relevant because the purpose of the 2011 hearing was to determine if the character of McKenzie's discharge was a bar to benefits, *not* to ascertain whether McKenzie suffered from PTSD.

87.   Even if it were proper for the AO to consider a past hearing on a different topic, McKenzie testified at length in those proceedings about his traumatic injury, abuse, and subsequent feelings commonly associated with PTSD during his service. In that hearing, McKenzie repeatedly described his anger, disappointment, and rejection; his mistrust of others and his feelings of separateness from his peers; and his detrimental reliance on drugs and alcohol. But neither the AO nor the Board considered these aspects.

88.  *Fourth,* the Board's decision failed to consider the evidence before it. The Board's decision never addressed the evidence presented by McKenzie's treating psychiatrist, Dr. Alford, by McKenzie himself, and by his wife and his friends.

89.  The Board's statement "there was no evidence that [McKenzie] … exhibited *any* symptoms of a mental health condition" ignored the statements of Dr. Alford, McKenzie, McKenzie's wife, and McKenzie's friends and further demonstrates that the Board failed to consider the evidence before it.

90.  For example, the decision never addressed Dr. Alford's reports based on her years in practice and years treating McKenzie in particular. Dr. Alford, who has been treating McKenzie since 2019, reported: "There is no question that Mr. McKenzie suffers from PTSD, as he meets the criteria quite easily and the records of his service support his abrupt decline in functioning and thereby support his [history] as he reports it." Dr. Alford also reported that in her "clinical opinion … [McKenzie's] substance use was an unfortunate coping mechanism, as often occurs in trauma victims."

91.  The Board failed to address statements and testimony from McKenzie himself. In his personal statement, McKenzie described "flashbacks, nightmares, [and] an absolute fear of the excruciating pain" that he endured after his training accident. Despite his best efforts to move past the experience, McKenzie felt "paralyzed." As his burgeoning mental illness made daily tasks impossible, McKenzie described feeling completely "useless" and "broken." Between his traumatic injury

and hazing by his peers, McKenzie felt like he had "already died" and was "doing time in hell."

92.    The decision also failed to address the statements of McKenzie's wife and friend who observed McKenzie's damaged mental health *immediately after* he returned home from service. For example, McKenzie's wife pinpointed the timing of the adverse changes to his mental health as immediately after his service, and McKenzie's lifelong friend described McKenzie as "truly different from the person I knew and loved" after his time in the Marines.

93.    Despite the fact that these statements are indicative of PTSD, the Board never addressed them or explained why they were unpersuasive, let alone under the "liberal consideration" standard.

94.    All told, the Board "failed to consider an important aspect" of the problem when it failed to "review [McKenzie's] claim with liberal consideration" as required by federal law. 10 U.S.C. § 1552(h)(2)(B).

95.    Moreover, in leaping to a conclusion based on a nearly 15-year old BVA proceedings on a different topic while ignoring record evidence from McKenzie, his physician, his wife, his friend, and the VA, without explaining why, the Board "fail[ed] to articulate a … rational connection" between its conclusion and the facts at hand. *See, e.g.*, *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 221 (2016).

96.    The Board also "offered an explanation for its decision that runs counter to the evidence" because it failed to address the medical evidence provided by

McKenzie's psychiatrist and failed to address the statements of McKenzie, his wife, and his lifelong friend. *State Farm*, 463 U.S. 29, at 43.

97.   For all of these reasons, the Board's decision should be set aside.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court issue judgment in his favor and against Defendants, and grant the following relief:

A.   Set aside the Board's denial of McKenzie's application for a discharge upgrade;

B.   Declare that the Board's decision to deny his application was arbitrary, capricious, unsupported by substantial evidence, contrary to law, and without observance of procedure required by law;

C.   Upgrade McKenzie's discharge characterization from "Under Other than Honorable Conditions" to "Honorable" or "General Under Honorable Conditions;"

D.   Change the narrative reason for his separation from "Misconduct— Pattern of Misconduct" to "Secretarial Authority" or "Miscellaneous/General Reasons."

E.   Correct McKenzie's Marine Corps records consistent with the above relief;

F.   In the alternative, remand for further proceedings to correct the errors identified above; and,

G.   Award such further relief as this Court deems just and proper.

Respectfully submitted,

_____/s/ Benjamin C. Block_____

Benjamin C. Block (DC Bar No. 479705)
Chase Woods (DC Bar No. 90020503)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001-4956
(202) 662-6000

Rochelle Bobroff (DC Bar No. 420892)
Abigail Reynolds (DC Bar No. 1735880)
NATIONAL VETERANS LEGAL SERVICES
 PROGRAM
1100 Wilson Blvd, Suite 900
Arlington, VA 22209
(202) 621-5709

—25—

bblock@cov.com                          rochelle@nvlsp.org
cwoods@cov.com                          abigail@nvlsp.org

*Counsel for Plaintiff*

Sept. 5, 2025